MARVIN, Judge.
Belverly White appeals her conviction, by a jury, of the manslaughter of her adopted four-year-old daughter, Jean Anneshia, primarily contending that the evidence was insufficient to convict.[1]
She also contends that the jury should not have been allowed to view photographs of the victim in the jury room during deliberations and that she was denied the right to present a defense because the court would not recess when the courtroom air conditioning failed during the time her expert witness was testifying.
We affirm.
ASSIGNMENT TWO
A juror must rely on his or her memory and is not permitted to have access to written evidence. A trial court may, when requested by a juror, allow the jury to examine, during deliberations, any. object or document that was received in evidence when a physical examination is required to enable the jury to reach a verdict. CCrP Art. 793.
A photograph is a reproduction of a physical object or scene. It is not “written” evidence or “testimony” within the meaning of Art. 793. The trial court granted the jury’s request to have all photographs after it retired to deliberate. The photographs had been offered as evidence by the defendant as well as by the State. We find no abuse of the court’s statutory discretion. State v. Overton, 337 So.2d 1058 (La.1976), and authorities cited therein.
ASSIGNMENT THREE
To defendant’s réquest that the court recess to a place that was air conditioned after the courtroom air conditioning failed, the court responded that there were no such facilities then available. Following the direct examination of the defense pathologist the court ordered a recess “to allow the jury to get something to drink.” Thereafter and notwithstanding that one of the defense counsel, Mr. Jack, objected to continuing without air conditioning and then moved for a mistrial, the court noted that fans were being used in the courtroom and that defendant’s pathologist had requested that she be allowed to complete her testimony on that day.
Although Mr. Jack’s motion for mistrial was denied, he gained the tacit approval of Mrs. Jack, lead defense counsel, and of the court to be excused from the courtroom. The record shows that he did not leave but stayed in the public seating area. Thereafter he gained a recess to allow him to confer with the defense pathologist. The cross-examination and re-direct examination of defendant’s pathologist was then completed without further incident. Except for one brief statement, the absence of air conditioning therein was not again mentioned.
Mr. Jack’s contention that the defendant was prevented from presenting a defense because of the condition of the courtroom is not supported by the record. We find no error or abuse of discretion in the trial court’s conduct of its proceedings in this respect.
ASSIGNMENT ONE
SUFFICIENCY OF THE EVIDENCE
When viewed in the light that most favorably supports the jury verdict, the evidence is sufficient to convict. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); LRS 15:438.
At age four months, Jean Anneshia was removed by DHHR from her natural moth *613 er and placed in foster care because she was a “failure to thrive” child. Fifteen months later physical custody was returned to her mother, where she remained for seven months until March 1984 when she was severely burned and received no medical treatment for three days. Jean Annes-hia was then surrendered for adoption by her parents. She returned to her former foster home until DHHR placed her with defendant and her husband. Because of the 1984 burns, Jean Anneshia had scars on her right forearm, on the front of her right thigh, the back of her right thigh which donated skin for skin grafts, and tiny splatter mark scars on her stomach. The injuries medically diagnosed in 1986 are in addition to the 1984 burn scars.
The custody of the victim was initially given to defendant by DHHR on June 14, 1985. The decree of adoption was granted on March 27, 1986, to defendant and her husband. On June 26, 1986, the adopted parents brought Jean Anneshia to the emergency room of the P & S Hospital in Shreveport, estimated by defendant’s husband to be a 25-mile trip from defendant’s home in DeSoto Parish. The child was dead on arrival.
The emergency room MD, Dr. Mora, opined that the child had been dead two or more hours because of rigor mortis observed in her neck, arms, and legs. He testified of numerous injuries and a massive infection, septicemia[2] or sepsis, of the child’s body and extremities which had existed for at least three weeks.
The child had no pulse, no blood pressure, and very dilated pupils. Her face and chin had contusions and abrasions. Some of her teeth were missing. On her chest were burn scars and her back had significant scars from third degree burns which Dr. Mora estimated were from three or four weeks to two months old. Her right front thigh had skin scraped or sloughed off. Both legs had recent burns along with superficial punctures, multiple tiny wounds, or linear punctures, produced by a very sharp object. Dr. Mora estimated these wounds were about a week old. Tremendous swelling was present in both thighs. Both hands were swollen. Her right hand was bruised on the back and the palm. After considering lab tests and X-rays, Dr. Mora opined that the child had massive septicemia throughout her body and that she was in a great deal of pain before her death.
A social worker at the hospital and defendant’s adoption case worker, who was called to the hospital, heard defendant say, either to one or both of them, or to relatives, “I killed my baby ... you don’t know what I’ve done ... You don’t know the horrible things I’ve done ... I’ve killed her.” Defendant also told her adoption worker that her eight-year-old natural daughter, “Victoria,” her husband, “Charles,” and her “family, ... would hate her” and that her family had told her “not to be so hard on Jean Anneshia.”
Victoria, the natural child of defendant and her husband, was seven when Jean Anneshia died. She was taken into protective custody at the hospital. She was placed in foster care in Mansfield, where she remained at time of trial.
Victoria testified that on the night before the child’s death, her mother made Jean Anneshia stand on a chair in her bedroom. Victoria stated the defendant whipped Jean Anneshia with a belt, beat her “hard” with the flat part of a knife “in between her legs,” hit her “hard” on her back with a clothes hanger, whipped her with the flat part of a comb, and hit her hand with the back part of a brush.
According to Victoria, defendant threw Jean Anneshia against the wall and against the bathtub “a lot,” causing Jean Annes-hia’s tooth to fall out. The defendant dipped the victim’s head in the bathtub and poured hot water on her. Victoria described how defendant hit Jean Anneshia’s forehead and chin “hard” and stated that *614 defendant sometimes made Jean Anneshia sleep outside the home at night. She demonstrated how Jean Anneshia was made to stand in a chair with her arms extended out until she sometimes fell.
Victoria stated that she was sometimes whipped by each of her parents on her back with a belt. She described no other punishment to herself.
On cross-examination, Victoria stated she saw Jean Anneshia speak to her father and walk in a stooped manner from the girls’ bedroom to the parents’ room on the morning she died. She was lying on a couch in that room when her father discovered that she was not breathing.
Defendant’s expert opined that Victoria’s testimony was “contaminated” by the manner in which the State’s investigation was conducted. The expert acknowledged that this did not mean Victoria’s testimony was fabricated or that it could not be verified or contradicted by other information.
Expert testimony of two pathologists, Dr. McCormick for the State and Dr. Norton for defendant, conflicted. Dr. McCormick performed his post-mortem examination within hours after the child’s body was brought to the P & S Hospital. Dr. Norton did her examination one week later.
DEFENSE PATHOLOGIST
Dr. Norton essentially opined that the injuries to the child could have been caused by accidents and accepted various explanations offered by defendant for the injuries, such as one or more falls from the back of a slowly moving pickup. The origin of the numerous linear puncture wounds over the child’s body, however, was not explained by Dr. Norton or other witnesses called by defendant. She admitted these wounds did not “fit” into the pattern of wounds of accidental origin. She generally explained that to distinguish accidental from intentional injuries
you look at the entire [injury] pattern and see it together ... you try to determine whether or not the medical evidence supports the history that you are given.
Because she had no explanation for the multiple linear puncture wounds, she speculated that they were post-mortem wounds, somehow inflicted after the child’s death:
I don’t know what kind of injury they are — which is why I classified them as post-mortem.
The jury could have understood Dr. Norton, as we understand her, to be saying that on the one hand you look at the total picture or pattern to determine if the injuries are consistent with the explanation that you are given, while on the other hand, you disregard the linear puncture wounds as inconsistent with that explanation. Dr. Norton’s testimony was somewhat enervated by her 1983 published article on abuse, as the State demonstrated during her cross-examination.[3]
In any event and when Dr. Norton’s testimony is weighed against the testimony of Dr. Mora and Dr. McCormick, who saw the child hours after her death, the jury was not unreasonable in discounting or disbelieving her opinion that there was no medical evidence that the child was beaten.
STATE’S PATHOLOGIST
Within hours after the child’s body reached P & S hospital, Dr. McCormick performed his autopsy. He concluded Jean Anneshia died of sepsis which caused
cardio-respiratory failure due to massive infection of her thighs, due to being severely beaten on those thighs and having her bloodstream bacteremia infect those thighs.
He found the injuries Dr. Mora noted. In addition, Dr. McCormick found that her frenulum (tissue holding upper lip in place) was torn, that two bums were on her right forearm near the old skin-grafted burn scar, that her lower right abdomen was bruised, and that she had several linear abrasions from her hairline to her shoulders.
*615 Dr. McCormick found Jean Anneshia’s body cold except for her thighs, which were hot to the touch, indicating massive and severe infection. Pattern injury was observed on the back of her right thigh and front and back of her left thigh where the linear punctures ran from her buttocks to her ankle. The pattern wounds were also observed on the left side of her face and her right hand. In his opinion the puncture wounds were older “than 24 hours, and not as much as several days.” Dr. McCormick stated the pattern of superficial punctures was made when the child was hit with great force with an instrument that had teeth.
Internally, bone-deep infection was found in both thighs. Infection was present in both hands, in the punctures, and in the back bums. A hematoma was present in the lower right abdomen and an internal bruise was present on her forehead which was not visible externally. This injury was several days older than the external abrasion. Other bruises were found over the top and back of her head. Her brain was bruised.
Dr. McCormick stated that internal bruises did not cause the death, but were related to the cause of death, child abuse syndrome. Dr. McCormick explained:
(A) So that there is no question that [the bum on her back] was a portal of entry of bacteria into the body. And that that had been there for days or weeks — and I think weeks — and that during that period of time this child had handled that wound without dying.
There were bacteria there, but she was not septic to the point of death.
At a later point in time she was beaten severely on the legs with an instrument which had teeth in it set in a regular pattern.
These teeth did not penetrate very deep into the leg, but the beating was so severe that there was braising, manifest by collections of gross blood, which we described as loculated hemorrhage, hemorrhage within pools, throughout the musculature of the leg, all the way to the bone.
All of this blood had bacteria in it. She is bacteremic; she has bacteria there.
Whether more bacteria entered through those puncture wounds makes not a hill of beans of difference.
But the fact that she was beaten severely on the legs enough to massively braise her legs gave those bacteria now such a place to grow. And also on the backs of her hands where there were collections of blood and bacteria.
Such a place [allowed bacteria] to grow in such overwhelming numbers that now her body could not survive, and she became septic and she died.
She died from sepsis, which was caused by the wounds on her legs, which were related to the bacteremia that she had from her burn. But without the wounds on the legs, she would have continued to survive, and she would have healed her back.
(Q) And would it be fair to characterize the infection you found in this child’s lower body, in her legs in particular, within hours after her death as a massive infection?
(A) The most massive I have ever seen in my 17 years of doing this.
Defendant’s characterization of Dr. McCormick’s testimony as inconsistent is not supported. He explained a person could have bacteremia (bacteria in the body) without being sick with septicemia which is the massive infection that fatally overwhelms the body.
The jury could have understood Dr. McCormick, Dr. Mora, and Victoria as we understand them. From our review of the sufficiency of the evidence, we understand
—the body with an existing infection is capable of resisting and overcoming the infection in time;
—if additional injuries are inflicted and cause large contusions or bruises (blood in tissue under the skin), affording a condition in which bacteria rapidly grow, the body cannot overcome the rapid growth of bacteria, and the massive infection, septicemia *616 or sepsis, overwhelms the body and causes cardio-respiratory failure that results first in great pain and then in death;
—the beatings defendant inflicted on Jean Anneshia by whipping her with things such as a knife blade, brush, and comb produced the bruises, or pooling of blood, that allowed the bacteria to rapidly grow and overwhelm the body.
The jury obviously found the explanations of defendant and her expert to be unreasonable and incredible and accepted or gave much greater weight and credibility to the State’s witnesses.
THE ELEMENTS
Manslaughter [in one context] is:
(2) A homicide committed, without any intent to cause death or great bodily harm[:] ...
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; ...
LRS 14:31, in part.
The felony on which the prosecution relied is LRS 14:93(A):
Cruelty to juveniles is the intentional ... mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child....
The elements of manslaughter in the context of the circumstances of this case are readily discerned. The State is obligated to prove each of the elements beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence. LRS 15:271,15:438; Jackson v. Virginia, supra; State v. Wright, 445 So.2d 1198 (La.1984).
By direct and circumstantial evidence, the State proved beyond a reasonable doubt
—that defendant intentionally mistreated Jean Anneshia (whipping her with combs, knives, etc., especially about the legs and hands) which caused bruises that first produced massive infection of her body and a great deal of pain [LRS 14:93(A) ], and then death;
—that Jean Anneshia’s homicide, without intent to cause death or great bodily harm, occurred because of this intentional mistreatment by defendant [LRS 14:31(2)(a) ].
The alternative innocent hypothesis or explanation offered by defendant and her expert was not found credible by the jury, or by this court on review. The evidence was sufficient to convict. Every element of the crime of manslaughter was therefore proved beyond a reasonable doubt.
DECREE
Defendant’s conviction is AFFIRMED.

. Defendant’s name appears most often spelled "Beverly.” Apparently, the correct spelling is "Belverly,” as defendant signed her name and as her attorneys usually spelled it.

. [An] invasion of the blood stream by virulent micro-organisms from a focus of infection marked by chills, fever, and prostration and often by the formation of secondary abscesses in various organs — called also blood poisoning. Webster's Third New International Dictionary, 1971.

. For instance, she wrote "... linear pattern bruising on children is almost without exception an indication of abuse_ A torn frenu-lum seldom occurs in the absence of abuse." Compare her and Dr. McCormick’s testimony, summarized or discussed, infra.